Good morning, Council. Mr. Morrisey, please proceed when you're ready. Good morning, and may it please the Court, Brian Morrisey for Petitioner Citadel FNGE. The Commission in this case made a highly irregular and arbitrary change to a market rule, revoking it at just one location on the electric grid, Northern Neck, while keeping it in place everywhere else in PJM's 13th State Territory. PJM claimed, and the Commission appears to agree, that this extraordinary change was necessary to spare consumers from paying unjust and unreasonably high electric rates. But none of PJM's evidence established that consumers were impacted at all, and it certainly did not attempt to establish how much actual rates increased. More fundamentally, the little evidence that the Commission did consider was severely out of date. This rule applies only when transmission lines are congested. But all of the evidence the Commission considered occurred before an important upgrade to a transmission line at Northern Neck that significantly diminished congestion there. The Commission acknowledged this, yet remarkably refused to consider any new evidence of the rates actually paid after that upgrade. In sum, this is not a case about consumers or any actual congestion that was occurring at the time the Commission ruled. Instead, the only clear result of the Commission's decision is to pick winners and losers among the more sophisticated participants in PJM's market for financial transmission rights, a form of insurance for congestion that spares PJM's members from paying the costs of a default if PJM is not. I think FERC uses the term rate payers when it's talking about costs, and that certainly could include individual consumers and their houses who flip the light switch on and on. Do you think that term could also include other entities, could be broader than just individual consumers? Well, I think, Your Honor, the Commission made a finding that scarcity pricing at this location increased rates, and it was talking about both the wholesale rate and the retail rate. And so in the initial order, it talked about rate payers, but in the hearing order, it explicitly talks about consumers on page 362, where it holds that scarcity pricing is increasing the zonal rate, and that reference is a reference to the retail rate, because the zonal price is the price that consumers in the Dominion zone pay. So, and I found pretty persuasive that if something's going to be divided by 1,400, it's going to start to get pretty small and maybe de minimis. But if that's the case, then how could a scarcity rate ever affect demand? Because the point, I think, of a scarcity rate is to increase supply, provide an incentive for more supply, because the supplier will make more money, and then also decrease demand by, I guess, raising rates on people who pay for electricity. But if whatever it is is going to be divided by 1,400, and that becomes de minimis, then it seems like it's never going to have an effect on the demand side. All right, well, Your Honor, I think it's important to think about that the foundation on which this case arises is that the Commission has already held that that premium, that increase in prices that you just talked about, is just and reasonable throughout Puget. And so the question is whether or not the Commission could make an exception only at Northern Bend. All right, I get the issue in this case. I'm just trying to take a step back and figure out how could the scarcity rate ever affect the demand side if its effect for individual consumers is going to be de minimis? Well, I think even in this case, the Commission hasn't even established an impact on consumers as a class. There's no evidence in this record about whether or not scarcity pricing impacted the wholesale rate or the retail rate at all. And the finding that the Commission made, the reason it said that this market rule is unjust and unreasonable, it said that it's increasing rates. And that's not established. And I get that. You kind of had me in a low on that part. And I'll try one more time, though. I'm just trying to figure out, maybe even before the year 2022, back in 2018 or 2019, if the cost increase for individuals is always going to be so dispersed that it looks pretty de minimis. And you say here, well, FERC didn't show an increase. Got it. And you say, and it probably is really, really small because it's being divided by 1,400. I got that, too. Then it seems like it's never going to have an effect on the demand side. The scarcity rate is never going to have an effect on the demand side. Your Honor, I certainly think there's no evidence in this record suggesting that it could for two reasons. You mentioned the dilution by 1,400. And then separately, when PJM came to the Commission and asked for the scarcity rate tariffs six years ago, it submitted a price study that said the overall impact of these increases in times of congestion would be negligible on the market. So, yes, we don't believe there's anything in this record. And so then I guess, what's the point? If it's not going to have an effect on the demand side, what's the point? Well, the point is that it does still stimulate potential increases in supply among the suppliers and utilities that provide service to ratepayers. And I think there's two reasons why the consumers are insulated by that. So there's still a price effect on utilities. There's still a price effect on the firms that purchase financial transmission rights, which are a form of insurance against the congestion. But the consumers are insulated first by the zonal rate, which you referred to, and second by the fact that their utility can purchase a financial transmission right that hedges those costs rather than passing them on to the consumers. So when there's congestion, someone pays. In this case, Hill Energy, the firm that was invested at Northern Neck, suffered losses. But there's no evidence in this record that that moves downstream to the consumer. Do you think as a matter of law that it's never possible to make a determination like that, not on the ultimate effect on an individual consumer, but on something that's a level up? Or do you think the problem here is the way that they explained, the particular way that they explained it pointed to consumer rates, in your view, and then that particular aspect of it wasn't backed up? So, Your Honor, I think we're not suggesting that in every just and reasonable case the consumer, but the evidence in this case doesn't establish even impacts on consumers as a class. That the evidence... Do you think that's necessary every time? Impact on consumers as a class? Yeah. Isn't it just rates? Don't we always just kind of assume that rates filter down? In some measure, they do. Your Honor, absolutely. I think for purposes of 206 and 205, the Commission's obligation is to assess the rate. But the Commission did make a specific finding here in the initial order and rehearing that this pricing was affecting consumers. And we think that finding is not supported by substantial evidence in the record. But we're not suggesting that the Court needs to create a rule that in every case, a particular amount of consumer evidence is necessary. So, if the... Even... I'll just assume for purposes of argument that that's the way you characterized it is right, then can the Commission just do the exact same thing, but then pin it on wholesale rates, and then everybody's fine? I'm sorry. You said pin it on wholesale rates. Just say that the effect is... That there is an effect on rates one level up without a commensurate benefit. And that's the rationale for not applying the scarcity rate. Well, Your Honor, this record doesn't substantiate that because the evidence that the Commission had was out of date even for wholesale rates. We had that intervening line upgrade. And so the only evidence for the Commission at the time of the rehearing order was there had been no congestion at all. So no impact even on wholesale rates at all for 10 weeks. But no guarantee that congestion might not reoccur on a high peak day. And our position is that that statement characterizes virtually every location on the grid. There's never any guarantee. And there's never been the standard that the Commission has expected from scarcity pricing anywhere else in PJM's market. The purpose of scarcity pricing is to identify and help to mitigate congestion. But the standard has never been under the orders of proving scarcity pricing to begin with that the Commission needs a guarantee that there'll be no congestion at that location. That's your second rationale, right? I mean, you started out by saying that you have two explanations, and that's on the second one. Is that right? You're talking about the improvements that were made? Correct. Yes. Right. The rate evidence was out of date because of the improvements, and then even before the improvements, it's incomplete because it doesn't show the wholesale rate or the retail rate that was paid. So we don't think this record even shows how much the wholesale rate went up based on scarcity pricing. And to have done that, Your Honor... It just has to, doesn't it? I mean, the whole point of a scarcity price is to affect the... It is to stimulate this kind of change, isn't it? Well, I think directionally, the Commission inferred that fluctuations in one element necessarily would increase the wholesale rate, but the Commission didn't quantify how much. And that matters because the Commission has said that in its brief to this Court on footnote nine, that a small increase is not per se unjust and unreasonable. So for the Commission to say there's an increase here, and it's increasing to an unjust and unreasonable level, whether that's a wholesale rate or retail rate, we submit that the Commission would have had to calculate how much. And it hasn't here, either before the line upgrade and certainly after, where there's no evidence of what the conditions were at Northern Deck after the upgrade. Can I just clarify? Do you dispute that, in fact, there would have been an impact on wholesale rates, that they would have increased, but your concern is that they didn't quantify? Or do you actually dispute that by this... The Commission's view is dramatic effect on a factor that makes up one-third of the wholesale rate. Do you dispute that there was any effect on wholesale rates? So I think it's fair for the Commission to infer as a theoretical matter that an increase in one element necessarily is going to increase the wholesale rate, but the Commission hasn't explained at all how much, and we would think of that as... Okay, usually about the quantification of it, but you don't dispute that, in fact, this would have had an impact on the wholesale rate? It would have before the upgrade, right? So the Commission had the two charts, but after the upgrade, we submit there's no evidence of even impact on wholesale rates. Right, but before the upgrade, you're not disputing that? We're not disputing that, theoretically, you can infer... Well, beyond theoretically, I mean, there's three components, right? There's the scarcity factor, transmission losses, and the cost of generating electricity. Does the record reveal or did you submit as part of your showing any evidence that the transmission loss factor or the cost of generating electricity had gone down, such as there would have been an offset of the increase by the scarcity factor component of the price? There is none of that evidence in the record. PJM carries the burden, since this is a jurisdiction proceeding and PJM possesses that data. Citadel identified that gap in the record to the Commission both at the initial order and the hearing order stage, and there's none of that evidence in the record. So we know fluctuations in one element, but we don't know what the bottom line wholesale rate was. Make sure our colleagues have additional questions, too. We'll give you a little time for rebuttal. We'll hear from the Commission now. Mr. Glover. Good morning. May it please the Court, I'm Matthew Glover and I represent the Commission. I think, Judge Mott, I'll start with what you were just asking my friend about. So there are three components to the rate, and what we know and what the record shows is that the congestion when the four combustion turbines, I believe they're natural gas turbines, on Northern Neck were being used was about $300 an hour, so you're adding that to the market rate, and then there's transmission losses. When the penalty factor hits, that congestion price goes from $300 to $2,000, so it goes up by $1,700. But you're still adding that to what the market rate would be, and so if the next minute or next five-minute increment there's no congestion at all, you go back to the market rate plus or minus losses, and I guess the losses go by, I don't want to get too technical. So we know that this one component is going up, and it's going up from $0 to $300 and then to $2,000 when that hits, and that's what that graph is kind of showing. Generally, in a market where there's no congestion, the market clearing price is the last unit that is called upon, and there was no congestion because they're controlling the constraint, but they are calling upon those four combustion turbines, and the market rate is $300, but the market rate is never above $300 if you're calling on those in a manner of congestion. They're producing the congestion price. So we know that this one component is significantly going up. I think in your call with my friend, you pointed out that we can assume that the wholesale rate is going up because this one component is going up. It's going up in a fairly large manner, but I think stepping down, is there any evidence that the other factors weren't, for some reason, the transmission costs and the generation costs, were stable or going down, or do we, because I know it's a big step up to $2,000, but in theory, if you have three factors and three components, one goes up, but another one goes way down, there could, you can't just assume, can you, that there's going to be an effect on the wholesale rate? No, but the fact that there's congestion here, it's being added to what the market rate is, and so the fact that they're turning those combustion turbines on, when those combustion turbines are being called upon, and it's congestion, they might be on when there's, when what's called the constraint control, or I'll say sort of the congestion control, they're being called upon, but maybe they're setting the market price at that point. You add the congestion factor to that market price. So if the congestion price is going up by $1,700, that's on top of the market price, and the market price can't be higher than whatever the last resource is already being called upon, and so if the last resource being called upon throughout the region is $2,000 a megawatt hour, well, first of all, again, not to get too technical, but part of what the penalty constraint does is it stops the PJM algorithm from looking for solutions above $2,000, but so if the last resource being called upon is above $2,000, then you're likely not having congestion if you are having prices at $2,000 unless there's truly a transmission constraint. So it would be very irregular, I guess, and you wouldn't be able to ever have those combustion turbines set the congestion price if the market price is always above their $300, in the $300 to $350 range, I think. Does that make sense, or am I getting too technical on obscurity? I was told there'd be no math in this. And so what I'm trying to say is the market price is already reflecting the transmission losses and the cost of generation, and so if we know we're compiling on top of that with the penalty factor, then we know it's having an effect. If I can step back, because, again, this is my own position in trying to kind of use non-technical words. The market price being sort of at the locational marginal price, the no price of Northern Neck, is the market price in PJM, or it's in the Dominion zone, plus cost of congestion, plus or minus the transmission losses. And so you know that you're adding congestion to whatever that market price is. So if the market price is going down, you're still adding congestion on top of that market price, it's still being reflected in. There wouldn't be a reason, if these four combustion turbines come online and there's still congestion, and then there's $300, you're still hitting the penalty factor at $2,000. You wouldn't see that the market price was like $2,000 and the combustion turbines were coming online as congestion results. They would just be online because they're market participants that are under a market price of $2,000. And then when the penalty factor hits, you'd be adding it on top of whatever the market price is. So I don't mean to get hyper-technical. No, no, you are doing your job and offering an explanation. I appreciate it. I think sort of stepping back, there's a secondary point, and it needs to be cleared in the hearing order. At paragraph 15 of JA359, we talked about the application of the penalty factor was not accomplishing its intended purpose because it was creating anomalous price signals that are not warranted or actionable, and therefore not accomplishing the purpose and intent of the factor. It is quoting the initial order of paragraph 60, which is JA310. It's cited in our brief at page 22 and at page 41. We didn't say that as sort of a platonic matter of rate, this penalty factor is unjustly high or something. What we said is, it's not serving its purpose. And as a result, it's raising rates without doing what it's intending to do and providing a commensurate benefit. So the way you just phrased that, I think to me is going to maybe decide the case in my mind. The benefit, is it a reduction in congestion? Is that the intended benefit? Or is it a complete elimination of all congestion? I'm not in his time, right? You can answer the question. I have a lot more if the Chief will let me. The statement that it's providing a cost without a commensurate benefit is that it's not serving its purpose. So can I step back and kind of walk through that? Absolutely. I don't want you to think I'm avoiding the word benefit. I used the word benefit 20 times in our brief. The orders actually only use it five times. The orders use purpose 11 times. I only use purpose 41 times in our brief. So I wish they had sort of focused on my point. And if there's errors, maybe I obscured it. But the purpose of the penalty factor in the short term is to incent generation or demand response, which is the reduction in generation rate. And in the long term, it's to incentivize investment if there's a long-term problem with improving transmission or adding generation. So here, the cause of the congestion is that the long-term purpose is being served. If I can give kind of an example. If you imagine the northern Nexus Peninsula and there's three bridges, and we're talking about traffic, and there's not normally traffic there, but one bridge is bigger than the others, and they are going to sort of reconstruct that bridge to make it even bigger. And when they take that bridge out of service, suddenly there's traffic on the other two lanes, and so you start charging the toll. The toll keeps going up. But long term, someone isn't going to look at those high tolls and say, gee, I should build a fourth bridge because there's only traffic because the third bridge is out of service. So that's the long-term purpose. We said that any price – and again, the purpose is to send price signals. Those are what the price signals are trying to get at. We said the price signal is to the long term and the short term, but we said four times to the long term, I think only twice to the short term. It's unwarranted, unnecessary. There's a few other words that we used. So we said here, this is a unique scenario where it's never going to be sending a long-term price signal. The short-term price signal, it sent. PJM, I think that's Dominion on Northern Neck, they fired up their four combustion turbines. They brought those online. Someone offered a tenth. I'm in the red light. You can get a little bit more of this example, so just cut me off when you want me to sit down. That one-tenth of a megawatt of offered demand response, like that's part of what we're trying to incent in the short term, but the evidence showed that even with the combustion turbine on and that demand response being offered, the penalty factor was still applied. PJM said that there's no additional demand. This is sort of geographically. I mean, it's fairly close to here, so it's not isolated in the sense of like Alaska or something, but geographically isolated from the power line, and there isn't generation on there. If someone, you know, there's a thing called a power ship, which can be a natural gas or nuclear ship, like if someone pulled the power ship up and hooked it up there, maybe there'd be new generation. There's no evidence in the record that was available. The evidence was there's no more generation. Before the commission, Citadel had said, yes, there is. Look at all these charts. PJM responded saying those are all in the queue and are going to take years and years. So the short-term price signal, generation, or demand response, went down online. We were still seeing the penalty factor hit frequently. We felt that it was unjust and unreasonable. It was not serving its purpose because it wasn't controlling the constraint. It couldn't incent more generation. It couldn't incent more demand response. And so, you know, we said in this unique scenario it wasn't going to apply. I think you have another question, but I was about to touch on Harmony Village, which may be your next question, but please, it's your time, not mine. Don't forget what you were going to say. I'd rather hear it, but this may inform what you're going to say. I'm still trying to figure out if the purpose of the rate is to completely, is to incentive, put the demand thing aside for a second, okay? Let's just look at the supply. Is the purpose of the scarcity rate to incentivize so much supply that there is no congestion? Or is the purpose a bit more modest? Is the purpose of the scarcity rate to incentivize more supply so that there is less congestion? It is to incentivize more supply so that there's less congestion, but we knew from the record, and again, their initial filing, their protest said, no, no, more supply could come online. PGM responded that there's a couple of charts, I can't remember where, where PGM went through each specific resource and why it couldn't come online. So we accepted PGM's record evidence, and we agree with them, that there was no possible future additional supply in the two-year window, which has been slightly extended for construction that isn't always on time. They stopped the construction of the Harmony Village. So then my follow-up question is what you anticipated, which is if the purpose of the scarcity rate is to incentivize more supply so that there is less congestion, didn't the Harmony Village upgrade do that? No, the Harmony Village upgrade was reconductoring, which is a reliability upgrade to the existing transmission lines. This is an argument that they might have made to the commission. They didn't, so obviously they can't make it here, but they might have said, when you say that the purpose of the penalty factor is to, in the short term, is to incent generation to come online or demand response. You're missing one. The third purpose is to incentivize reliability projects that up the conductor and allow you to peak slightly better transmission lines. If the delivery of supply is more reliable, it seems to me like that's an increase in the delivery of supply. But it's not incenting generation. So we were talking about incenting generation or demand. I know you don't want to talk about demand, I'm sorry, so I'll stop. Incenting generation, right? That's a reliability project that they undertook. They undertook it in reaction because they recognize there's a problem going on here. Our long-term solution is causing all this congestion. Let's see what we can do in terms of improving the, it's really, it's not like they're making them bigger or something, but they're allowing them to get closer to there. If I agree with you that on the supply side, all we care about is generation, why would that be? Why would we just care about generation as opposed to the efficient delivery of what's generated? I'm not sure that the efficient delivery is kind of doing away with the problem that you're still having the penalty factor fit, the problem that it still can't send a signal. There's not going to be any more generation or more demand response. And here it's sort of unique because, again, the only way to do the reconductoring was to stop doing what was causing the congestion. They had to put the Lenexa line back into service. So if I can go back to my bridge example. We know we don't need a fourth bridge. In the short term, let's put the larger bridge back in service. Let's stop doing our construction upgrades to it. And let's re-seal the asphalt on the other bridges so that we can raise the speed limit a little bit more. Higher speed limit is going to reduce traffic a little bit. The pricing signal isn't designed for you to stop a transmission project and go look at other reliability things you might infect here and there. We didn't talk about transmission upgrades when we were talking about the purpose of the scarcity rate. In the short term, we want those combustion turbines that aren't running normally to be fired up and put online. And so that's what we're looking to do here. As to Harmony Village, again, it goes back to, in the rehearing order, we said, I think it's paragraph 15, it's either 15 or 20 because those are where we did a lot of the work in the hearing order. But we said that even after the reconvection, after the sort of improvement to the reliability rating of the other two lines, there was no indication that when the pricing was being sent, it's still not being sent in an unwarranted manner. Again, in the long term, it's unwarranted because the Lenexa line is what's sending the price signal by having the penalty constraint apply. And in the short term, it's unreasonable because we know that there is, or not serving its purpose, sorry, because we know that there is no additional generation and no one had offered demand response. I was going to change topics, so if you have a follow-up. I have one follow-up. I'll follow up after you follow up. Let's anticipate that. So on Harmony Village, I'm just trying to understand it at a high level of generality. Harmony Village, something changed that I think you wouldn't dispute that whatever changed at Harmony Village is an improvement of some sort. And so then the question in my mind is,  petition to get rid of the scarcity rate. Or is it just irrelevant to that? It doesn't resolve the problem. And the problem being you're sending a price signal without serving its purpose. So just, I don't want to quibble, but I'm not asking whether it resolved it. In other words, whether it completely resolved it. I'm just asking whether it alleviated it in any measure. Or is it just, is it orthogonal? Or is it just something that's, in your mind and in the commission's mind, something different? Two answers to that. The first is, as to what the price signal is doing, it is something different in short term. But as to the physics of alleviating, and again, I'll try to keep it at a really high level, and just stop me if I'm being too technical. What it was doing, the reconductoring, so you have a reliability violation before you get to sort of the maximum power that you can have on there. And there's certain levels of reliability violations. And when you get to a higher level, they have to do what's called load shedding. Start stopping power, cutting off power. So the reconductoring was meant to have the sort of reliability rating where you start tripping on those. And that's what determines congestion. To have that go up at peak hours, so that as summer was coming, you were going to have some peak hours. The record has evidence that summer is less of a concern here because of the solar that's on Northern Next. But anyway, so the idea was, yes, that by reconductoring, the reliability violation is going to be a little bit higher in terms of the amount of power on those lines before we start triggering the reliability concern. So it's going to help, but it is not the solution that the price signal is meant to send. And our predictive judgment in the reviewing order on May 18th was the informational filing, May something. In May 2022, we said that we reconducted these lines. Our predictive judgment was that, well, that would help. It meant that where you're going to have the congestion hitting is going to be slightly higher because those lines can now take more before they have that personal liability violation. Even in spite of that, the price signal, if it's sent, is still going to be unjust and unreasonable because it's still not serving those two purposes. And we think that it will continue to be sent. There have been informational filings since then. This was sort of our predictive judgment, something that we do when we make predictive judgments. We often ask, as we did here, for PGM to keep filing these informational filings. The record you're looking at is our predictive judgment on May whatever. But they kept making those filings. They've shown, I think, again, the most recent one is available on our webpage, but it was filed only a few weeks ago. So I think it showed about 473 intervals that hit during the three months preceding February or March. But so, you know, our predictive judgment is actually... Sorry, when you say they hit, that meant triggered the penalty factor? Yeah, sorry, the penalty factor was triggered. I apologize. The penalty factor was triggered. That's the appropriate way. So our predictive judgment has been backed up. But part of the importance of the informational filings is if Citadel looked at those and said, gee, there's no more congestion here. There's no more problem here. They could file a new complaint saying you made a predictive judgment. Your predictive judgment hasn't panned out. This is no longer this unique scenario. So then the level of generality we were just operating under. So Harmony Village, it does... The improvements at Harmony Village on that line do help alleviate congestion. But your point is that the scarcity price is still going to be triggered and it's still going to beget the same two problems, notwithstanding the congestion alleviation from the improvements on Harmony Village. And the two problems, how do you describe those two again? The problem is that it's not serving its purpose. And the purposes are short-term and long-term. Okay, so you're talking about short-term and long-term. Inducing the kinds of investments that the scarcity price is intended to do in the first place. So long-term is inducing the investments. And like we said, I think pretty clearly, although people often say because the commission tends to talk in technical terms, that things aren't always clear. We did say that the long-term signal would be unwarranted. I took that to mean unnecessary. I don't think we used duplicative. I think long-term... I'm not even sure that Citadel disagrees on long-term because that just seems almost like an identity because the whole reason we got into this situation in the first place is because of a long-term change. So on the short-term, the Harmony Village in your view isn't even a short-term result of scarcity pricing. It's a result of PGM doing everything they could and Dominion to their credit as well to try to work with the problem here. But they couldn't have done that solution without bringing Lenexa back online. So you had two different entities. One owned Harmony Village and one owned Lenexa. And the one that owned Lenexa said, I'm not going to stop my construction project so that you can improve this other line. I'm going to keep doing my construction project. I mean, then taking Harmony Village, it was 26 days or something, but offline would be a huge problem. So it's not the sort of solution that we're looking to. We talked about, again, the purpose in the short-term being generation, demand and response. They didn't say there's a third purpose, reliability projects that are short-term for transmission lines, and you've missed that third purpose. So we're not debating what those two purposes are. And again, even with the improvements, the reconductor and raising the point at which the congestion, allowing more power to run on that at extreme times. Even with that, we thought any price signal that's going to be sent by the penalties that they're applying here is still going to be sending the wrong message because you can't add, PGM's proven there's no additional generation. No one is offering demand response or there's no more offers or significant offers of demand response on the short-term. And I don't need to, I think, address the long-term. But that's where I think, you know, I believe it's paragraph 15 in the reply brief, and then paragraph 20 is where we talk about substantial evidence. I realize I haven't even addressed the substantial evidence. I'm well into my time. I just want to, oh, actually. I wanted to get back to where Judge Walker was starting with you, and that is, is the point of the messages that the penalty factor is sending to eliminate congestion completely or just to take it down some. And you said, well, you know, reducing is good. That's forward progress. But it must be, so is the commission's decision here, it's got to be sort of a material, the penalty factor is designed to accomplish at least a material reduction in how often the penalty factor is being triggered or how often congestion happens? Or is it really, I would have thought its goal would be to not have the penalty factor triggering other than in its, you know, I don't know if there's a normal of once a year or something, but really to get out of this sort of crisis stage they were in and have in the norm across the year or the seasons that we're going to have enough supply that we don't have to hit that extreme level. And so I was just trying to get more clarification on your response because if your response is all the penalty factor wants to do is if we get increased generation for one day, you know, that's one day better where the penalty factor wasn't triggering. But I would have thought the point of the penalty factor is to have something more materially changed that's going to endure. And if it's just a quick fix today and maybe three months from now we'll come up with another quick fix for a couple days or a week, that's not what its goal is. Judge, the last part I think is what you didn't, your prior understanding, so not the last part of what you're saying, is correct and it's my apology if I confused you. The penalty factor, again, it actually does two things. One, and this goes to the Order 888 changes and whatnot, the penalty factor is actually an effect in their algorithm where you could keep looking for solutions and maybe there was a solution that's going to cost $100,000 a megawatt hour that will actually provide the right power here or something. I could offer, and if I live on Northern, I could offer massive and I was in a lunar shelter there or something that took up most of the power. I could offer demand response at $100,000 a megawatt hour. PGM's not going to consider that. So in their algorithm, the penalty factor is when you stop looking for a solution to the congestion. And when it used to do that and it didn't set the price, the price would be set at what the replacement rate here sets the price at, which is we stopped looking at $2,000 an hour. What was the most expensive? And there's still congestion. What's the most expensive unit online? $300. Okay. The congestion cost is $300 in Northern next. When they amended the tariff and part of the amendments in Order 888, we wanted you to put the penalty factor in your tariff so everyone could see it. We wanted you to explain when it would set the price, but it doesn't actually have to set the price. You can have a penalty factor that doesn't set the price, but they chose to make it set the price. It sets the price. The goal in that price is I think exactly what you said. You're going to alleviate congestion. If it's long-term or you need long-term investment, there may be a long time to fix that. In the short term, hopefully people are getting generation online or offering demand response so that it's not going to be hitting over and over and over. That is the goal and that is the purpose of the penalty factor. And so if you have in response, the only response to the penalty factor is getting triggered again and again, abnormally. It's high since it's the 2000 market. They have to cut things off and with abnormal frequency, it's getting triggered. And in response, someone says, oh, well, I can unplug this big industrial thing over here. We're not using it this year. And so you have a sudden demand decrease that makes enough of a difference that the penalty factor is only getting, it's getting triggered, say, 20% less often, but it's still pretty frequent. So you've had a little adjustment here, but say you've gone down 20% less hours, the penalty factor is getting triggered, but it's still abnormally high. Would that be a successful signal by the penalty, for the way the commission talked about it? Would the penalty factor have accomplished its goal by having that small marginal change in demand that made, it didn't make an incremental increase on the number of times the penalty factor is triggering, but didn't, it's still happening at an abnormal frequency. And the other signals, like here, the normal signals aren't going to work at some other construction project or something. Am I making any sense? Yeah. I think my answer sort of changed by the last sentence you said there, which is, it's the scenario we have here where the construction, the transmission line upgrade is what's causing it, right? If I can just kind of take your hypothetical but cut off the last sentence, aluminum smelters take an incredible amount of power, that's why Europe is shutting them down, that's why Boeing was based in the Northwest, cheap hydroelectricity, we built planes, we won World War II. So if you put an aluminum smelter on a northern neck in the last few years, and you turn it on, and it massively increases demand there, and all of a sudden northern neck is congested, all three lines are in service, they're perfectly in service, that's a sign that we need generation on northern neck, or we need a new transmission line, and that would be the penalty factor for sending this long-term signal that you need to make a long-term upgrade, right? And so the commission hasn't said, you know, oh wait, if it hits a bunch of times in that scenario, we would lift it. You couldn't even, I don't think, point to our orders here and say, we would lift it in that scenario, because our orders here are narrow, and so we say, in these specific circumstances, in the circumstances presented here, and we did emphasize that there's no long-term, it's an unwarranted long-term price signal to build more transmission, because the building of the transmission is what's causing. Is it also an unwarranted short-term signal? As to a short-term signal, if there was additional generation on northern neck, right, it would be doing a good job. In this case, on this record, was it also an unwarranted short-term signal, notwithstanding the response at Harmony Village? I guess that's what I'm trying to get at. The short-term signal was answered, if I can kind of, by the demand response and the increase in generation. Continuing to use that short-term signal when there's, PJ has shown there's no additional generation that could come online, and I don't know how often people offer demand, but no one else had offered demand response. So it's not that the short-term signal was unwarranted initially when it got those two responses. No, but keeping it. Keeping it is unwarranted because there's nothing else. There's no, that's what I was, and I was not, what I was trying to get to is, fine, that helped Harmony Village, although we don't know how much because Lenexa was back online, but, you know, that helped a bit, but we're still going to have an abnormal level of penalty factor triggering, and there's no more short-term and there's no more long-term and there's no more demand. Is that how to understand what the commission was saying here? Yes, absolutely, and I apologize. No, I'm sorry, my misarticulation. And, I think, sorry. They're not looking for just any change in any response to the scarcity or the penalty factor. They're not looking for anything, even if it's small and brief. They're looking for something that is going, I assume the goal is the equilibrium where you're not, you're not triggering the penalty factor with any frequency at all, or if you do, it's temporary. It doesn't happen again and again and again and again and again. Yes, Your Honor. So, it's more of a, they're looking, they want the penalty factor to be making a material difference in generation or demand, short-term or long-term. Yes, sending a price signal that incentivizes these. Can I, can I, can I follow up on that? I think I'm making things worse. So, no, no. So, if, if, continuing with a penalty factor after Harmony Village would, in a hypothetical universe, get additional Harmony Villages. So, you still, there's still gains to be had. They're not going to eliminate the congestion problem entirely, but they're improvements. And, there's still going to be improvements that don't completely solve the situation, but they're continuing improvements. Then, would maintenance of the penalty factor be warranted? I, I think so. The commission, again, it's finding here with, there was nothing else. It sort of goes back to, and I don't mean to quibble with the hypothetical, but our statement of what the short-term goals were, were not reliability sort of addition. So, if the short-term improvement was, again, not just kind of be funnier, but one of these Russian built nuclear power shifts, they offered to bring it over and hook it up, but they're going to charge 1,900 a megawatt hour or something. The penalty factor, you know, keeps hitting after Harmony Village, but they hooked that up, and they contracted PGM, PGM filed an informational filing saying, this power shift was going to come, and it will be here in six days, whatever. We might, on the 12th day, or after some period of time, seeing that that has done the front, say, gee, the penalty factor is serving its purpose. We should, you know, it's no longer a situation where we should exempt the penalty factor, and if the power shift is not enough occasionally, okay, but there was more generation to come online. Now, the evidence in this record was, there's no additional generation, there's no additional demand response, and, you know. When you say no, just to clarify, I apologize, I'm sorry. When you say no additional generation, you mean long term or short term? Short term, because, again, No, we don't long term. Long term, we don't need anything. Once we open the next line, or add the second set of lines there, it will solve a long term problem. So, but you're, you're, you're fastening onto the, the, the concept of generation, and, and the way you're conceiving of it, Harmony Village is not generation, it's reliability. So, I guess what I'm asking is, am I capturing it at least? That's true. It's a reliability improvement, yes. So, if you have additional reliability improvements in the offering, and they're tied to the scarcity rate, then is that a justification for not alleviating the scarcity rate, for keeping it in place? I think the evidence in that record, we'd have to look at that record differently, right? If, between the initial order and the rehearing order, again, just to a predictor, does someone have said, gee, we can actually, you know, keep the, or the next in line on, but we'll keep it on at 50%, while we do our upgrade, and that's gonna open up part of that, and so we think that will resolve it. Like, that may have been another solution, but when you're setting that scarcity price, you're trying to incentivize behavior. The behavior you're not, like, that we weren't sort of looking at incentivizing, wasn't, gee, do reliability upgrades. It was get some, in the short term, get some generation online, or find some demand response. And the reason, the reason you're not looking at reliability, as opposed to generation, is because of the way the, so, reliability upgrades are designed to sort of help the system, provide for the system. The reliability upgrades are gonna be done on transmission. Transmission gets the cost of service, right? So, if we take the Harmony Village reconductoring, the cost of that, like, the penalty factor doesn't incentivize, if you had a merchant transmission, if I own Harmony Village, and it's the only thing I own, it's my only asset, it's the Glover line, you know, if there's congestion going on in Northern Net, they send this $2,000 a megawatt hour price signal, but if I own that line, I'm getting a cost of service rate, so that price signal doesn't do anything to me. It might tell Dominion to call me and say, hey, why don't you fix up your line, or do something, but I'm gonna recover the cost of that line improvement in my cost of service rate. And so, I'm not paying or receiving the price of power, I'm getting transmission fees. So, you know, you're adding a price signal to the price of power to try to incentivize activity in that market, if that makes sense. And reliability, so just one basic question, then, that I might be confused on, and I'm sure it's my own confusion. Does the scarcity rate, does it map onto a reliability improvement, at all, or is your point that conceptually, that doesn't make sense? In the long term, reliability improvements are the sort of thing that you would want to incentivize. When we talk about additional transmission, or take the Lenexa line, it's technically a reliability, but PJM discovered that they wanted to increase that line, because they were having some reliability issues out at Northern NEC. So, but if the penalty factor has been getting triggered, if we had all of this same evidence, but the Lenexa line was online the whole time, and PJM said, gee, the penalty factor is hitting a lot at Northern NEC. We would like you to suspend it, because the reason it's hitting is, we don't have enough transmission, and, you know, we can't get more transmission in the next two years. We wouldn't say, oh, tough. We would say, gee, more transmission is the long term pricing, but it's trying to send. Now, someone might come and say, gee, this is just unreasonable, because it's going to apply every day, for .3 hours, or two hours every day, for 12 months, and then we might be doing additional laying, but we looked at this record, where we said the long term signal was unwarranted, and said, on that record, we don't think applying the penalty factor is appropriate. It's sort of a scenario, as if they had come to us, before they took Lenexa offline, and said, gee, once we take Lenexa offline, the penalty factor is going to be hitting, frequently, consistently, and there's no long term price signal. So, will you waive this, in conjunction with our reliability project? You know, something like that. That's a different kind of forward looking estimate, we need to make. Okay. I just want to make one point. Oh, sorry. I know you want to get to another topic, can I ask one more? Please, please, please. You can change topics. When you're talking about existing generation, which Harmony Village was, Harmony Village is existing transmission. Existing transmission, excuse me, sorry, existing transmission. Do you need a penalty factor, to incentivize, sort of, maintenance and repairs like this, and upgrades, or does it, because you're already existing within PJM, do you have distinct obligations to, do the upgrades and maintenance and improvements, so the penalty factor just isn't trying to incentivize, and Harmony Village is going to do this anyhow, it's just a question of when. So, that's why the penalty factor isn't speaking, at least to existing transmission, about upgrades, is that right? I mean, it's speaking to, is there a need for more transmission, when you're talking about like a reliability upgrade, et cetera, yes, the penalty factor is not trying to send the message, and there's, I can give a type in the record, this is something that I was reading in the JA last night, if you look at JA 259, PJM explains that their transmission analysis, when they're trying to determine, when we need to have reliability improvements, on transmission, this is a continuum thing they did, they identified the Lenexa line upgrade, as something that was sort of continually, they were going to look for, they talk about that their transmission analysis, is limited to reliability studies, and does not consider possible congestion, that may result from the line outage, they were responding to arguments by Citadel, in the record saying, you should have known that when you took, you planned the Lenexa thing years in advance, you should have known when you took that out of line, there'd be congestion, and you should have planned ahead for this, and their response was, when we're doing these reliability studies, and there's acronyms for them, et cetera, but when we're kind of improving, and figuring out the transmission, and the reliability, all we're looking at is, reliability failures, not congestion, so that's not something we were evaluating, so judging on to your point, the price signal, the penalty factors meant to send, is not, gee, change where you're doing, your regular reliability, and transmission upgrades, it may send a signal that, gee, you don't have, again in my aluminum smelter example, or a bunch of people moved to Northern Neck, during the pandemic, and people weren't using power, but now they are, and it's quadrupled the demand out there, you need a new transmission line, like it might send that signal, or in lieu of a new transmission line, why not improve Lenexa, and build out all of these lines, and kind of make them, you know, sufficiently stronger, or less likely to hit a penalty factor, so I know we're quite over time, so I'm going to ask three questions at one time, maybe take a note if that's helpful, and then answer them as concisely as possible, and I'll try to show some restraint, and not ask follow-up questions, so related to what we've been talking about, FERC's initial order said, based on the record before us, we find the continued application, of the transmission constraint penalty factors, thus will not result in generation, demand response, or transmission investment, to resolve the current situation, so that connects to my first question, which is, you are an unfailingly prepared oral advocate, and I suspect that if you had written FERC's orders, they would be more persuasive than they are, but what would you say to someone who says, I read FERC's orders, and what you've been saying for the past 30 minutes, is pretty foreign to me, so that's my first question, then the second question, very different topic, quick response to Commissioner Danley's remark, markets cannot work, when high prices that occur by design, are disallowed in practice, and then last question, hypothetical, maybe not the most analogous hypothetical, but imagine, imagine someone goes to a casino, and places a bet on the outcome of the game, they win, to the tune of $50 million, the government swoops in and says, you're not going to get paid, don't you think that that would disincentivize, future people, from placing similar bets at the casino? I'll start with the casino hypothetical, it would disincentivize it, but the price signal as an incentive, if I map that onto our situation here, is not to incentivize or not incentivize, the financial transmission market, the market my friend was talking about, is to incentivize fixing, the congestion problem in the long term, alleviating it in the short term, so I don't think the example that the government swoops in, I made a bet on a game in the future, and I assumed that in the future, the rules of that game were going to be, the team can play two quarterbacks, and the NFL changed, and it's for next season, the FDR I think will be a year ahead, and the NFL does a rule change in the middle, and they say from now on, you can only start one quarterback, that's not a very good example, the NBA, if I can, college basketball, I made a bet on next year's college basketball, because I think a team that's really good at shooting threes, is going to win, and college says, actually we're getting rid of the three point line, and we're getting rid of the shot clock, suddenly UVA is going to look really good, under Tony Bennett, and maybe not as good, but I made a bet on next year, the NCAA, in this scenario, we are also taking, PGA is also monitoring the betting market, the rule is being changed going forward, it's not being changed to, you already having won that 50 million dollar bet, in your example, if that makes sense, and again, the market they're talking about, the financial transmission rights market, they made some arguments to the commission, a pretty interesting one, about the CFTC regulatory, for the financial transmission market, they don't make any of those here, and so we recognize, that any time you make a forward looking change, when TJM first started having the penalty factor, set the price, rather than just having it stop the algorithm, that changed the market, anyone who had a financial transmission right, in the future, if it was a counter flow, kind of a negative right, they might be in trouble, because now, the transmission, or the congestion charge could go up, they made a bad bet, but that was a forward looking fix, so, I'll defend to that, as the commissioner Dan Link, he believed that the, his statement was, that the pricing factor worked, the majority of the commissioners found, that it was not working, indeed it could not serve its purpose, so, you know, the majority opinion, and the majority hearing opinion, both took a different view, of whether or not it worked, your first comment was, about the initial order, is that a factual finding, whether it worked, or is that a legal finding, I think, there doesn't seem to be a dispute, about what signal it's supposed to send, everyone seems to agree, on what it's supposed to signal, and the commission said, that it's not doing that, and if the dissenting commission, thought it was, that sounds like a factual dispute, I think it is, it's certainly a dispute, about the rate, and whether the rate, is achieving a signal, and so, I think that's, you know, sometimes when you talk, about getting a deference, on complex rate making determination, right, the rate making determinations, are factual, but they're also judgment calls, and things like that, that maybe aren't pure facts, but I think, that generally falls, would be falling, under a factual, or judgment call, as to whether or not, serving its purpose, again, if they had made this challenge, that when you lifted the purposes, you lifted them wrong, as a legal matter, like here's what order 844, said about the purposes, and here's all these other things, they could be challenging that, like it was just arbitrary, and capricious of us, to change the purpose of this, you know, or at least we needed to explain, why we were changing the purpose, and then we would look, a lot more, you know, did we give an explanation, for our analysis, of what is, or isn't unjust, and unreasonable, if I can make two, just tiny points, one is, the idea, that we need to quantify, you know, we said in our brief, that their argument, it said, once this is understood, their argument, about the failure, to quantify the price, is irrelevant, we didn't say, that the transmission, penalty price,  so I think, they misrepresented that, in the reply brief, but the reason, that it's irrelevant, is it's not serving its purpose, the reason their argument, is irrelevant, the preceding two pages, of our brief, I think explains that, when you look, at cost of service rates, that's where this actually, could be really helpful, cost of service rates, this court, in a case called, Newman versus Firk, in 2022, banned us from, or told us, we were wrong, to allow entities, to include lobbying costs, if I can simplify it, in their cost of service rate, there would be no excuse, if Dominion added, you know, $500 of lobbying costs, in the account, which they're not, supposed to do, someone found it, came to Firk and said, Dominion added $500, of lobbying costs, and we said, hey, there's 1,400 nodes, Dominion Virginia, has 2.3 million customers, you know, that's fractions of a penny, yes, they violated, the court's directive to us, on what is, or isn't allowed, but, it was not unjust, and unreasonable, to violate that law, so in a cost of service rate, this idea, that we need to quantify, that's where you kind of, blatantly see it's wrong, and I'll conclude, with just a tiny point, again, not to pick on my friends, but in the reply brief, they say that, we concede, or we seemingly agree, with them, that remand should be, with Vacater, the commission's general practice, is not to address, whether or not to remand, without Vacater, because the first step, of the allied signal test is, could we fix the error, or how significant was the error, we don't think we've errored, you'll tell us if we do, the second step, what are the actual, market impacts, goes to, you know, what PJM knows, because they're the one, that's going to have to kind of, unwind this, so our practice, and this court, in a number of recent cases, Judge Mod, your opinion, which I like to cite, as a jurisdictional point, for Schaefer, and Freeman Lake, I have a citation, for other recent opinions, where you have remanded, without vacating, American Pain Power Association, in 2022, Judge Walker, Judge Chernoff, and you were on with, you know, she didn't write it, I didn't quickly find one, you wrote it, but you've remanded, without vacating, you know, five times in the last three years, where we didn't address it, in our briefs, but the interveners, did address it, you've never understood us, to be conceding, or agreeing, that you would need to vacate, and I hope, that you won't do that here, we will change our practice, if that is what, you instruct us to do, but our general practice, is not to address that. Some people say, we vacate five times, before breakfast. That could be true, I think I wouldn't be, making this point, if I was arguing, to a panel, of Judge Chantel, Judge Randolph, and Judge Beaton, sitting by designation, because I'd be in trouble, but you know. Can I get you, to hit the first question, that I asked, remember there were three, the first one was, what would you say, to someone who says, most of what you said today, sounds pretty foreign, to someone who's just, read the orders. I think I would say, that if you look at, a couple of passages, in the orders, that talk about, initial order, paragraph 59, J 309, PJM has not shown, that under the constraint, that under the specific,        and it's not, achieving its intended purpose, in the Northern Neck Peninsula, and it's not, achieving its intended purpose, in the Northern Neck Peninsula, and it's not, it is resulting, in an inappropriate price, and an inappropriate, price signal, that establishes, higher prices, without a commensurate benefit, we therefore agree, that it's not reasonable, so again, we were saying, that it's established, sending a price signal, that's inappropriate, and it's unjust, and unreasonable, because it's not, serving its purpose, it cannot, or you know, it would, the purpose, it can't serve its purpose, I have some other, paragraphs, I think it's 15, in the reply brief, or the rehearing order, sorry, and 20, in the rehearing order, where we address, that the penalty factor, is not serving, its purpose, you know, that was our determination, again, the dissenting commission, to sort of combine, your first and second questions, you think that my discussion, of how the transmission upgrade, sounds foreign, okay fair enough, the dissenting commissioner, thought, that the price, sent its purpose, and we got this, transmission upgrade, as I hope, fully explained it, in my call, with Judge Millet, you know, that upgrade, isn't resolving this, we're making, a predictive judgment, that we're going, to keep having, this constraint, being binding, and so, you know, we made a predictive judgment, but in the majority view, it was not serving, its purpose, in the sense view, it was, sorry, I know I've gone way over, I'm going to be in trouble, we will continue, to ask you questions, thank you Mr. Glover, let me make sure, additional ones, thank you Mr. Glover, we'll hear from the, intervenors counsel now, Mr. Flynn, good morning, Paul Flynn, so, let me see, if I can answer, a few questions, that were on you, maybe that would be helpful, first, the base energy price, and the congestion, let me give you, a simple definition, base is, the closest generation, which is, inexpensive, okay, and can I access, through my transmission line, some inexpensive generation, if I can, that's what sets the base, but if I have to, pay a higher price, because the transmission line, is congested, in order to get a closer, generator, that's what congestion price is, that's why it is always, on top of, and well above, what the base energy price is, because the base is, consistent with the stuff,        and what the base energy, is, is the base energy, is the base energy, is the base energy, is the base energy, is the base energy, is the base energy, which is the total, of the $2,000, is quite large. My impression of the order, and I'm not looking right at, the order so, forgive me if there's a misquote, the purpose of the high price, is quote, to provide market signals, that incentivize supply, and or load response, to help mitigate, the constraint in the short term, how is Harmony Village not that, okay, let's talk a little bit, about the question, that's been kicking around, of how much is enough, is it all or is it some, right, so I'd say it depends, upon the factual context, and here we have, a peninsula, with three lines, certainly, and one of them, one of the biggest ones, is out of the picture, okay, that's our base set of facts, out of the base set of facts, is we know there's only two, small combustion turbines in there, that can help, and we know there's essentially, no demand response, that can help, so the question becomes, let's suppose that, and which is true, this is what the record says, that Harmony does increase, that new conductor, increased the line rating, on that line, and allows you to bring in, more power, that's good, and it does ameliorate, it does ameliorate, the congestion situation, to some extent, the record is, that PJM, in their May 2022 report, said, yes, it is providing some amelioration, it's now in effect, that's good, but we are still concerned, looking out, that this coming summer, and next winter, that there are going to be, high load periods, where this will still be a problem, and that's why PJM, in each of these reports, which are ordered by the Turks, okay, report to us every few months, on how this is doing, PJM said, in each of those reports, and we think we need, to still keep it in place, okay, because of that, because, Judge Miller sort of got it, with her take on it, which is, is it essentially tapped out, given this set of facts, that you only have the two lines, you don't have much generation, you don't have much demand response, there isn't, you're not going to have, a transmission project, that's just going to appear, out of nowhere, all of a sudden, I mean, you know if that's coming or not, within the timeframe of two years, and there isn't any, and so the question becomes, is it just unreasonable, to continue to allow, that $2,000, charge to be triggered, if you know you're tapped out at this point, and there's nothing else out there, that's essentially the record, that was before the commission, and that's what PJM said, in their May report, and that's what FERC picked up on, in their review and order, at paragraph 15, page 1442, JA359, where they, did in fact, cite to that report, that we gave them, shortly before the issue, so that's my answer, to the question of, how much is enough, on that, I think in general, the idea of setting, that administrative charge, of $2,000, is to try and resolve the problem, and that's why you're setting it so high, and the problem here, is because of, peninsula, we've lost the main line, and there's not much there, so, we're not getting it, even at the $2,000, we're not getting a resolution, and so that's why it becomes, unjust and unreasonable, to any extent, to continue demanding, that people pay that $2,000, if you know to a pretty good certainty, that, there's nothing else out there to bring in, within the time frame, that this line is going to be up, that's the essence of what, PGM was selling for, and that's the essence of what, FERC found on the record. So can I ask this question? Sure. If, the way you've described it, it sounds like you're saying, the degree, the Harmony Village improvement, it was an improvement, the Harmony Village improvement, might have resulted from, the scarcity pricing, but there's no more Harmony Villages to be had, that's one way to look at it, another way to look at it is, Harmony Villages doesn't have anything to do with, scarcity pricing, it would have happened anyway, so it's just not even, something that ought to be taken into account, and, it sounds to me like you're more on the first axis, than the first possibility, than the second one, and the evidence is that, and what the commission, in your view correctly assumed is, that there aren't other short term improvements, there aren't short term improvements, that are in the offing, by result of continuing, to allow the scarcity price to be imposed. Thank you for clarifying, and framing the question that way, I do not disagree with Mr. Glover, I do not disagree with Mr. Glover on this point, I do not disagree with Mr. Glover on this point, the, the, the rate based project, that Dominion brought in, which was at the directive of the PGM board, in the regional transformation expansion, planning process, is not the type of project, that is going to be directly influenced by the fact, that at this node, suppliers are receiving that $2,000 payment. Okay, that's not, how you do, transmission planning, for a, investor owned utility, rate based project. Maybe, if there was a merchant transition project out there, I could see that, but, it is not a good fit, for that type of consideration, and, it's also the case that, there's a distinction in transmission planning, between reliability and economic, and when they're talking economic, when they're talking reliability, it's that you're going to violate, some reliability standard, and so don't do that. When you're talking about economic, you're saying, should I violate a reliability standard? There's more congestion, there's more cost. When you said in your brief, or you said in your filing, I'm sorry, not your filings, that, the Harmony Village project, was accelerated, because of the scarcity factor, the penalty factor, that was. We said it was accelerating, I don't know that we said it was accelerating. Okay, so why isn't it because of that? So, it's going to happen at some point, but it happened, sooner, because the penalty factor, prompted it to happen, at a time, that was needed, urgently. So, why isn't that a response, why doesn't that, it's not just, that this was some upgrade, that was going to happen, anyhow, the timing was changed, to alleviate, a congestion problem. And FERC says it's much, right? I didn't see that in FERC words, I mean, FERC said it was. Well, you said, GA 253, so, PBJM said it was accelerated, because of the, congestion problem. Uh, by two months. But, we also said, that, uh, we had concerns, that, Harmony Village, was not going to solve the problem, during high, low periods, in the upcoming summer. That was our fundamental observation, about Harmony Village. We did say it would alleviate, that it did alleviate, congestion. Uh, but then the question becomes, now what? We've got two more years of this, or a year and a half of this, because it turns out it's going to be, through July 2024, so two years now. Uh, does it make sense, to continue, charging that $2,000 charge, if it's not true, that there's anything else out there, to respond to that? Whether it's a new transmission project, or whether it's a new generation, that's got to come into the queue, we addressed that on the record, and we didn't see the... Why isn't the appropriate response, to wait and see, if this problem comes back again? Say that again? Why wasn't the appropriate response, to wait and see, if the problem comes back again? Like, okay, thank you very much, Harmony Village, um, but, we fear, the problem's going to recur. It wasn't recurring, at the time those filings were made, so why, why wouldn't you wait, to see if it does happen, and then, set the penalty factor? I will give you my take on that, I think it's supported by the record. PJM looked at, when congestion was occurring. It was occurring during high load periods, on winter days, when, you couldn't bring the solar resources, to there. Because, in the winter, it's a shorter day, and they weren't available, in the earlier hours, and the later hours, and that is the time period, when you receive, the prices jump up. So, PJM and its experts, are looking at that, and saying, that is the state of affairs. Okay? And we know, the experts will say, and we know, that, you are bringing, X amounts you can, are capable of bringing, X amount of additional power, sort of on a consistent basis, with Harmony. And my take is that, putting those two things together, they're saying, it still looks to us, like that issue, that we saw, rather substantially, this past winter. There's a good chance, that still will be a problem, this coming summer, and next winter. Which is what we said, in our report, and what's our quote. Let me make sure, my colleagues don't have, additional questions. Yeah, if you have a quick point. Yeah, briefly on, retail and wholesale. I mean, what's odd about that, is that, in their return request, Citadel said, nothing in the record, shows any causal link, from the wholesale rate, to an average impact, on these surveys. I.e., the average total price, paid by consumers. That is material enough, to warrant the extraordinary, limit grab, that that's, JA325. Also, at JA330, 333. And, FERC responded. I mean, that is a head-scratcher, to me. Because, FERC doesn't do, retail rates. And, that's exactly, what they said, on the union. Our jurisdiction, only extends, the wholesale rates. That's what they said, to be here in order, paragraph 20, of JA362. So, I'm not sure, what the make, of their reference, to consumers. But, they pretty clearly said, in response, to the union request, we only do, wholesale rates. Which, makes perfect sense. Thank you. We appreciate, your argument. Mr. Morrissey, we'll give you, some rebuttal time. We'll, normally, in a ten minute argument, it would be two minutes, of rebuttal. We'll double it, to four, and see where we go, given the amount of time, we've taken up so far. Thank you, Your Honor, I'll, be brief. Just a few points. We, counsel discussed, the purpose, of the scarcity rate. The purpose of that rate, is to increase supply, either, through generation, or through increases, in transmission capacity. The commission, has not previously, made this distinction, about, only seeking generation. And, we would point the court, to the commission's order, approving the scarcity rate, to begin with. The commission's two orders, in this case, and PJM's affidavit, in support of its request, for this relief. We submit, that we got that kind of benefit, here, as, Judge Millett was discussing, with counsel. PJM said, they accelerated this, Harmony Village 1 upgrade, in response, to the scarcity pricing. But, at the very minimum, the Harmony Village upgrade, shows, that whatever conditions, existed before, whatever conditions, existed in the two charts, that PJM submitted, were over, by March. The commission mentions, that it was concerned, that the rate, might still apply, with that normal frequency. We would ask, based on what? Because, all the evidence, of the frequency, of the rate applying, was from January, and February. And, the record establishes, that by April, the Harmony Village line, was, the Harmony Village upgrade, was complete. And, there had been no congestion. What the commission said, about that, is that, even though that's so, we have no guarantees, that congestion, might not reoccur, on high peak days. And, we would submit, that's not an adequate basis, to treat this location, different, than all the rest. Where the scarcity rate, does apply, on high peak days. And so, that's not a basis, for treating Northern Neck, differently. If the commission was concerned, about potential, high frequencies, of the rate applying, after Harmony Village, we would submit, that it was obligated, to collect, and consider evidence, after the upgrade, which it did not do. And, we would ask the court, to vacate the case. FERC's strongest argument, seems to be, that, okay, sure, the rate incentivized, to Harmony Village. But, now, everything is tapped out. Nothing else, can be done. And so, the scarcity rate, will not lead, to any increases, in supply, no increases, in transmission, nothing, tapped out. What's your response? Our response is, that there's not an evidentiary basis, to make that conclusion. Because, there's no evidence, the grid footprint changes, after the upgrade. And, the commission acknowledges, that the upgrade occurred, but the commission doesn't, get into the details, of how much, transmission capacity, changed. Why do we think, that, no more supply, can get in? Or, that demand responses, might not be possible, after that upgrade. The only evidence, the commission had, was two charts, one from a single day, in January, and one from two weeks, in February. So, there's no evidence, in front of the commission, about, what the supply, and demand conditions, were at Northern Neck, after that upgrade. Well, they had a lot of information, right? That beyond, those charts. And, that is, this is a, at least, for purposes of a power grid, isolated area. And, it only has, sort of, three sources. And, the main one, was going to be offline. There was no, not going to be, and I didn't see you, arguing otherwise, any chance of, long term investment, coming in, to address congestion. And, I didn't hear, you guys identify, or anybody else, figure out, what other short term, solution, there could have been. And, no one's arguing, that there could have been, demand. It's sufficient, relevant amount of demand, decreased. So, it's the combination, of those charts, showing abnormal, frequency, of triggering, of the, penalty factor, in response, to taking, Lenexa offline. And, the nature, of its location, you're not going to be able, to just sort of, turn things out, and send some power in, from another area, because it's just, the lines aren't there. And, so there's just, there's no movement, there's no solution, here. So, why isn't that, enough, for them to have made, the tapped out, judgments, that Judge Walker, was referencing? Your Honor, we would submit, that after the Harmony Line, Village upgrade was complete, the Commission didn't even, have evidence, of a continuing problem. All the evidence, of the frequency, of the rate applying, comes before that upgrade. So, while the, the geographics, haven't changed, right, because there's only, three lines, the fact that you have, high frequency, of the rate applying, all takes place before, that increase, in transmission capacity. And, so what the Commission, didn't have, was any evidence, saying how much, the scarcity rate, is being triggered, after that increase, in transmission capacity, from Harmony Village. The only thing it had, was it's concern, potentially in the future, that there might be, congestion on high peak days, which is a statement, that we submit, applies everywhere, in Northern Neck, where this congestion, pricing continues, to be the default rule. Well, they had, I guess, these three lines, and, was the other one, the Fredericksburg, or something like that, so, I thought it was, pretty much recognized, that the Lenexa line, was, even prior to this, construction that's going on, was sort of the main, the big line. Yes. And, was Harmony Village, the smallest, of the three? It's smaller, than Lenexa. It's smaller, than Fredericksburg? I'm not positive, that it is. We have a sense, of what, so, here, I'm going to get, in my trouble with math, again, but if we assume, on the three lines, that, just assume, that, Lenexa, traditionally carried, 60%, of the, power load in, transmitted it in, and, Fredericksburg did, 30, and Harmony Village, did 10. And, if the Harmony Village, improvements, they're not going to get it, up to 60. Maybe they got it, up to 15, or something. Then, they don't need to wait, do they need to wait, for the, you know, the house to start, burning down again, or can they go, thank you very much, for the extra 5%, but the problem here, is that we've lost, the 60%. Right. And that 5%, is not going to make, a material, difference. Didn't people just know, that was Harmony Village, was just sort of, a smaller contributor, even upgraded? So, Your Honor, I would submit, that that's exactly, the type of analysis, the Commission, should have gone through here, but did, you know, we know that Harmony Village, is smaller than Lenexa, but what the Commission, did not discuss, or analyze in this order, is precisely this question. How much more capacity, are we getting from Harmony Village, than we had before? Yeah, I'm asking, given sort of the structure, of the Northern Neck, was there any, was it, remotely feasible? Yes. That the Harmony Village, which is just, an upgrade, an improvement here, was going to come, even closer, to making up for, the continued absence, for two more years, of the Lenexa line? Was it, was it, was it an increment, worth the candle, or was that sort of, built into the structure? I think it was, absolutely feasible, and the best sort of, Is it worth the candle? If that's feasible, of course you can measure it, the question is, No, I think it is worth the candle. No one knows, everyone knows the answer, is going to be, I'm right, everyone knows the answer, is going to be, come on, that there's no way, Harmony Village could pick up, and you know, carry the load, for Lenexa, for the next two years. I think it is, absolutely worth the candle, and the best source, I would point your honor to, is page 348, of the joint appendix, which is the May 18th filing, that council mentioned, where PJM said, the upgrade has occurred, right, it's finished, it's finished as of April, and there's been no congestion, at Northern Neck, for 10 weeks, starting on March 15th, all the way up, to the rehearing order, on May 31st, and where PJM said, is the only thing, we're worried about, is that we might, get congestion, on high peak days, well every relocation, can get congestion. Can you clarify one thing, you said, sorry, what date, was the upgrade, on Harmony Village, completed? So the date, that it was completed, was April 26th. Okay, so not having, congestion from, you mentioned a March date, until April, that's because Lenexa, was back online, it's got nothing to do, with the upgrade. Correct, Lenexa was put back online, to fix. Right, so that was the whole problem, part of the situation, so saying, that there was no problem, from March until April, isn't addressing, the fact that, Harmony Village, is now going to carry, the water, the power, for Lenexa. Right. And so, I'm not sure, that that statement, is helping me understand this. So you have, Harmony Village is done, and now it's carrying the water, starting on April 26th, and May 18th, PJM files it's information,  there's still been, no congestion. Sure, but now we got solar, working probably, a lot more often, because it's spreading, and it's causing, congestion. Well, correct, right, but, we've now changed, now we're in a very, different position, right, than when PJM, came to the commission, in January, saying, this rate is applying, very frequently, right, by May 18th, PJM says, Harmony Village has done enough, that now all we're worried about, is the hottest days of summer, and the coldest days of winter, and that's it, they don't quantify, how many times do they expect, the scarcity rates, will apply on those hot, and cold days. And so, they're going to have to, they're going to have to wait, for the problems to occur, because the winter problem, is going to be back, unless, anyone thought for a minute, that Harmony Village, could carry all the water, then, you're not going to have, this whole kind of winter, which was the problem, in the January, February charts, you're going to have that, for two more, full winters. They certainly, could have waited, but they also, could have done the analysis, that your questions earlier, were suggesting, right, taking, okay, from May, let's look at, how much, transmission capacity, the Harmony Village line, upgrade is adding, let's look at, supply and demand conditions, before, and let's make, an estimate, not just the generalized, you know, fear, of how many, how many times, we think the scarcity rate, is going to apply. There's not even, an estimate, in the record, about how much PJM, or their commission thinks, this is going to be triggered, after the Harmony Village, line upgrade. And so, we would submit, that that finding, is not supported, by substantial. Okay, thank you, counsel. Thank you, to all counsel. We'll take this case,
judges: Srinivasan, Millett, Walker